UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,

      Plaintiff/Counter-Defendant,            Case No. 12-11863
                                                Honorable Thomas L. Ludington

v.

KASEY McDERMOTT,

      Defendant/Counter-Plaintiff.

_____/

**OPINION AND ORDER GRANTING IN PART**
**PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

From September 2005 until January 2012, Kasey McDermott and Brien Mathews lived together on Woodbridge Street in Bay City, Michigan. But on January 13, 2012, a fire erupted in the couple's basement during operation of Mathews's butane "honey oil" production lab.[1] Nationwide Mutual Fire Insurance Company (Nationwide), the company that had issued a fire-insurance policy on the home, paid Kasey McDermott $160,209.50 after the fire destroyed the house and some of her possessions. But after learning the fire was caused by Mathews's marijuana lab, Nationwide wants the money back. Based on what follows, Nationwide's motion for summary judgment will be granted in part.

**I**

**A**

In September 2005, McDermott purchased the residence located at 202 South Woodbridge Street in Bay City, Michigan. Along with Mathews and her two children from a

_____

[1] Butane honey oil, as will be explained herein, involves the use of liquid butane to extract THC from marijuana plants. The THC-infused butane is then evaporated away, leaving behind a potent, THC-rich wax that is heated and inhaled.

previous marriage, McDermott then moved into the home.[2]   At that time, she entered into a homeowner-insurance agreement with Nationwide.   Under the agreement, McDermott made periodic payments and Nationwide provided "the insurance described in th[e] policy."  Pl.'s Mot. Ex. 2, at A1, ECF No. 15.

Beginning sometime in 2007, McDermott began working as a transportation coordinatior for OminiSource (a regional trucking company in Bay City), and she works there to this day.  In 2008, Mathews opened a restaurant called Sunshine Coney in Bay City.  In August of 2009, he decided to move the restaurant to the Fashion Square Mall in Saginaw, Michigan. Unfortunately, unable to turn a profit, Mathews eventually "[s]hut it down" in January 2011. Mathews Dep. 7, *attached as* Pl.'s Mot. Ex. 5.

Lacking a consistent source of income, Mathews turned to marijuana cultivation in the "[m]iddle of 2010."  *Id.* at 35.  Under Michigan's Medical Marihuana Act (MMMA) (Mich. Comp. Laws § 333.26421 *et seq*.), an individual with a "registry identification card" can legally possess up to "2.5 ounces of usable marihuana" and "12 marihuana plants kept in an enclosed, locked facility."  Mich. Comp. Laws § 333.26424(a).  If an individual becomes a "primary caregiver," he or she may assist qualifying patients with the medical use of marijuana in accordance with the MMMA.  Mich. Comp. Laws § 333.26424(b).  "A registered primary caregiver may receive compensation for costs associated with assisting a registered qualifying patient in the medical use of marihuana."  Mich. Comp. Laws § 333.26424(e).  Such a primary caregiver may possess:

> (1) 2.5 ounces of usable marihuana for each qualifying patient to whom he or she
>      is connected through the department's registration process; and

---

[2] Although Mathews and McDermott were dating in September 2005, they were married on February 23, 2006.

(2) For each registered qualifying patient who has specified that the primary caregiver will be allowed under state law to cultivate marihuana for the qualifying patient, 12 marihuana plants kept in an enclosed, locked facility; and

(3) Any incidental amount of seeds, stalks, and unusable roots.

Mich. Comp. Laws § 333.26424(b).

Mathews first acquired a "registry identification card" from Dr. Ruth Buck. He then obtained a second card from a doctor in Mt. Morris, Michigan. (Although, at his deposition, Mathews was unable to recall that doctor's name.) Mathews then acquired customers. At the time of the fire in January 2012, Mathews's operation served four customers, which included himself, and he was classified as a marijuana "caregiver." However, all the paperwork and cards he had were lost "in the fire." Mathews Dep. 11.

After obtaining his "registry identification card," Mathews then poured his full attention into marijuana production. He grew marijuana and then delivered it to his customers. Mathews worked to expand the operation "up to eight hours a day." *Id*. at 30. Over the course of two years, he funneled $20,000 into his lab, purchasing dirt, fertilizer, and "[t]ons of lighting." *Id*. at 15. The operation took place almost exclusively in the basement of the home Mathews shared with McDermott.[3] One room contained plants in the "vegetative state," ranging from seedlings to month-old plants. *Id*. at 32–33. A second room served as Mathews's "flower room," where the plants would stay for two additional months while they matured. *Id*. at 33. Approximately 90 days after planting, Mathews would harvest the marijuana and sell the resulting crop to his customers. When Sunshine Coney closed, marijuana proceeds were his sole income, and he dreamed of one day "being able to make it a business." *Id*. at 10.

---

[3] Occasionally Mathews operated out of the garage of the home as well.

Sometime after he began manufacturing marijuana, Mathews learned of a process known as "butane extraction." The process involves drawing liquid butane through chopped marijuana leaves. The butane absorbs the THC[4] from the marijuana and is then poured into a container. As the butane evaporates, a sticky, THC-rich substance is left behind. That substance, commonly referred to as "honey oil" (or "ear wax"), is then heated and the intoxicating fumes are inhaled. This "concentrated form of THC" was something that Mathews and his customers "loved." *Id.* at 39–40.

Mathews performed butane extraction in the following manner: First, he took a length of PVC pipe[5] and affixed a "coffee filter on the end of it." *Id.* at 37. He then filled the interior of the pipe with chopped marijuana leaves. A cap with a "little hole drilled in the top" was attached to the pipe, opposite the coffee filter, to complete the gadget. *Id.*

Then came the butane. Butanes "are highly flammable, colorless, easily liquefied gases." *Butane*, Wikipedia.org, https://en.wikipedia.org/wiki/Butane (last visited June 19, 2013). Mathews obtained numerous cans of butane. The cans had a bright, red flame imprinted on the front, and warning labels on the can clearly indicate "DANGER" — that the contents are "under pressure," "flammable," and "may catch fire" or "explode if heated." Pl.'s Mot. Ex. 9, at 3156, 3159. Indeed, the purpose of butane is to burn, and it is commonly used as fuel for lighters and hand-held torches.

Mathews took these cans of butane, inserted the spray nozzle through the hole in the cap of the PVC pipe, and then emptied their contents into the chopped marijuana leaves. The butane would rush out of the can, pass through the leaves to "strip the Cannabinoids," Mathews Dep. 39, and then strain through the coffee filter on the other end of the pipe. Mathews would empty six

---

[4] Tetrahydrocannabinol, the principal psychoactive constituent of the cannabis plant.

[5] A pipe made from polyvinyl chloride — abbreviated PVC — a common plastic.

cans through the PVC pipe, let the THC-infused butane run into a glass jar, and then pour the contents of the jar into a pie plate.  If he wished to process additional pie plates, Mathews would cycle new marijuana leaves into the pipe and empty another six cans of butane.[6]  Once in the pie plates, the butane would take "hours and hours to evaporate" until the honey oil was left behind.  *Id*. at 47.  After that had occurred, Mathews would scrape his spoils off of the pie plate with a razorblade.

Mathews testified at his deposition that he understood butane extraction was risky.  He always "turned off the hot water heater through the extraction process" because he was aware "that butane was highly flammable."  *Id*. at 55–56.  He knew that he "didn't want to have any source of ignition around the butane."  *Id*. at 55.  In fact, Mathews knew "not to smoke" when he was using butane, and to keep it away from "open flame" and "any object that sparks."  *Id*. at 61–62.  But despite the risks, the production of honey oil was lucrative.  Mathews testified that while a gram of marijuana typically goes for between $10 and $20, a gram of honey oil sells for $80.  *Id*. at 40.

At her deposition, McDermott testified that she knew Mathews grew marijuana in the basement, but did not know that he was creating honey oil through butane extraction.  McDermott Dep. 28, *attached as* Pl.'s Mot. Ex. 4.  Although she had "[s]een butane cans before the fire," she never "read a can or picked up a can."  *Id*. at 26.  And though McDermott had "heard of the word butane," she claims she was not aware that it was flammable before the fire.  *Id*. at 29.  She testified that had she known Mathews was using "a flammable gas[] to manufacture a certain kind of marijuana oil," she would have stopped him.  *Id*. at 32.

---

[6] Each pie plate required six cans of butane and a fresh set of marijuana leaves.  Mathews Dep. 44, 56.

**B**

On January 13, 2012, while the kids were away at school and McDermott was away at work, Mathews brought the lab into full swing.  Instead of the normal "one or two" pie plates, Mathews cranked production volume up to four.  Mathews Dep. 44.  Because each plate required six cans of butane, Mathews emptied 24 cans of butane through the PVC pipe.  *Id*. at 56–57.

Then, while he was waiting for the butane to evaporate, Mathews grew impatient to test the fruit of his labor.  So he used a razorblade to collect some of the honey oil from the edge of one of the pie plates while half of the liquid butane remained.  *Id*. at 48.  Mathews then used a welding torch to heat the oil he had collected on the razorblade so that he could inhale the THC-riddled fumes.  He did not move away from the butane-filled pie plates before doing so.  Unfortunately, but not unexpectedly, the use of the hand-held torch in a basement full of butane vapor ignited the liquid butane in one of the pie plates.

The ensuing blaze roared toward the ceiling of the basement.  Mathews "tried to take the pie plate and take it off the table that [he] had it sitting on . . . to give it more room to burn without burning the ceiling."  *Id*. at 51.  But when he moved it, "the liquid shook, and it spilled over on to [Mathews's] arms."  *Id*.  So he dropped the pie plate, "and it splattered and ignited the rest."  *Id*.  Mathews believes the fire was caused "because the butane had not evaporated fully" when he lit the welding torch.  *Id*. at 51.

When Mathews was unable to quench the flames, he grabbed his coat and crawled up the stairs and out of his house.  *Id*. at 54.  He then called 911.  It was right around 11:00 a.m. on January 13, 2012.  The unchecked fire consumed the house and the majority of the possessions it contained.

**C**

Noted above, McDermott applied for a Nationwide Homeowner Policy on September 1, 2005.  Pesut Aff. ¶ 3, *attached as* Pl.'s Mot. Ex. 11.  The initial policy was issued on September 7, 2005 and then renewed on a yearly basis through September 2012.  *Id*. at ¶¶ 5, 9.

At the time of the fire in January 2012, the policy in effect (the Policy) provided that Nationwide would "cover accidental direct physical loss to property described in Coverages A and B except for losses excluded under Section I — Property Exclusions."  Policy C1, *attached as* Pl.'s Mot. Ex. 2.  Coverages A and B provide as follows:

**COVERAGE A – DWELLING**

We cover:

1. the dwelling on the residence premises used mainly as your private residence, including attached structures and attached wall-to-wall carpeting.
2. materials or supplies on or adjacent to the residence premises for use in construction, alteration or repair of:
   a) the dwelling; or
   b) Coverage B – Other Structures.

We do not cover land or the replacement, rebuilding, restoration, stabilization or value of such land.

**COVERAGE B – OTHER STRUCTURES**

We cover other structures on the residence premises. They must be separated from the dwelling by clear space. Structures connected to the dwelling by only a fence, utility line, or similar connection are considered other structures.

We do not cover:

1. other structures used in whole or in part for business purposes.
2. other structures rented or held for rental to anyone, unless used solely as a private garage.
3. land or the replacement, rebuilding, restoration, stabilization or value of such land.

Policy B1.

As the Policy made clear, some types of loss were not covered by Nationwide.  The "Property Exclusions" section established that Nationwide "do[es] not cover loss to any property

resulting directly or indirectly from any of the following.  Such a loss is excluded even if another peril or event contributed concurrently or in sequence to cause the loss."  Policy D1.  The Policy then listed a number of exclusions.  Relevant here, losses caused by an "Increased Hazard, meaning any loss occurring while hazard is increased by a means within the control and knowledge of an insured[,]" were excluded from coverage.  *Id*.  The Policy defined an "insured" as the named policy holder, his or her spouse, and any relatives or dependents under the age of 21 who lived at the residence premises.  *Id*. at A1.

## D

After the January 2012 fire destroyed Mathews and McDermott's house, and many of their possessions, McDermott filed a claim for coverage.  Nationwide then issued checks totaling $160,209.50 to pay for McDermott's losses and to provide for temporary accommodations.  *See* Def.'s Resp. Ex. D, at 1, ECF No. 17.

However, investigators then learned about the source of the fire.  On April 25, 2012, Nationwide issued a letter to McDermott which indicated that "Nationwide has determined that there is no coverage available for the claim as a result of the fire of 1/13/12 at 202 S. Woodbridge, Bay City, Michigan 48706."  *Id*. at 2.  The letter continued:

> The investigation has disclosed that on or about 1/13/12 Brien Mathews was operating an illegal marijuana and THC manufacturing facility in the basement of the "Residence Premises" at 202 S. Woodbridge and was performing an activity described as butane extraction which involved the use of highly flammable butane which was passed through a tube of chopped marijuana materials to form a substance referred to as butane honey oil which is an extraction of THC from the marijuana plant materials to convert low quality marijuana to a high quality oil to be used and sold.

> In the course of manufacturing the butane honey oil on 1/13/12, Brien Mathews introduced a flame into the process while surrounded by highly flammable butane and butane fumes resulting in ignition of the butane and a fire causing damages to the "Residence Premises" and its contents.

*Id*.  After detailing the Policy's provisions, Nationwide established that coverage was to be denied:

> There is no coverage for any of the damages claimed by Kasey McDermott as a result of the fire on January 13, 2012 for the following reasons:
>
> > (a) The one family private residence dwelling was being used as a marijuana, butane honey oil and THC manufacturing facility which was illegal and not insured under the Coverage Agreements.
> >
> > (b) There was no accidental direct physical loss to property.
> >
> > (c) Even if there was coverage, any coverage would be excluded by the Increased Hazard exclusion.
> >
> > (d) Even if there was coverage, coverage would be excluded by the Intentional Acts exclusion.
> >
> > (e) There was a failure to comply with the General Policy Conditions including failure to advise of the change in use of the "Residence Premises" to be used as a marijuana, butane honey oil and THC manufacturing facility.
> >
> > (f) There was a failure to comply with the General Policy Conditions pertaining to Concealment, Fraud or Misrepresentation by misrepresenting the use of the premises, and by concealing, misrepresenting and omitting material facts in regard to the premises, and the loss.
> >
> > (g) By the wrongful conduct rule per *Orzel v. Scott Drug Co.*, 449 Mich. 550 (1995), by operating an illegal marijuana, butane honey oil and THC manufacturing facility.
> >
> > (h) Any Loss of Use coverage does not apply to an insured's business.

*Id*. at 6–7.  Finally, Nationwide indicated that it had "filed a declaratory complaint" in order to "determine the rights and obligations of the parties under the policy, and to obtain reimbursement of the amounts paid to date on this claim totaling $160,209.50."  *Id*.

As indicated, Nationwide filed the complaint seeking declaratory judgment on April 25, 2012.  McDermott answered, and filed a counterclaim, on June 20, 2012.  In her counterclaim,

McDermott alleges that Nationwide breached the parties' agreement and violated Michigan's fire insurance policies, Mich. Comp. Laws § 500.2833, by failing to cover her claims. *See* Countercl. ¶¶ 1–19, ECF No. 4.  The Court has jurisdiction over the case by virtue of diversity (Nationwide is an Ohio corporation with its principal place of business in Columbus Ohio, McDermott is a resident of Michigan, and the amount in controversy exceeds $75,000). *See* Pl.'s Compl. ¶¶ 1–3, ECF No. 1.

### E

On March 29, 2013, Nationwide filed a motion for summary judgment.  Nationwide argues that McDermott's loss is not covered under the Policy for many of the same reasons identified in the denial-of-claim letter discussed above. (Specifically: the loss was not the result of an accident; the loss was due to an increased hazard; the loss was due to intentional acts; there was no disclosure of change of use or change of occupancy; and any loss was the result of wrongful conduct and recovery is barred.)

On April 19, 2013, McDermott filed a response to Nationwide's motion.  The response also included a cross-motion for summary judgment. *See* Def.'s Resp. 12–13.  Notably, the dispositive motions deadline was March 29, 2013 — three weeks before McDermott brought her motion.  Also, this Court's rules prohibit filing a motion for summary judgment as a part of a response brief.[7]  Accordingly, the portion of McDermott's response that asserted summary judgment was warranted on her behalf was stricken. *See* June 6, 2013 Order 3–4, ECF No. 22.  Along with McDermott's motion for summary judgment, a supplemental brief she had filed was also stricken. *Id.*

---

[7] *See* Motion Practice Guidelines for Judge Thomas L. Ludington, Separate Motion and Brief — *available at* http://www.mied.uscourts.gov/Judges/guidelines/topic.cfm?topic_id=360 — "Motions may not be included within or appended to a response or a reply."

Thus, currently pending is Nationwide's motion for summary judgment, which asserts that McDermott's loss is not covered and she owes Nationwide $160,209.50.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

On an additional point, because jurisdiction in this case is predicated upon diversity, Michigan law is to be applied. As has long been established, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996).

Finally, as this case involves contract interpretation, unless there is ambiguity in the Policy, the Court is required to enforce the insurance contract in accordance with its terms as written. *Klapp v. United Ins. Grp. Agency, Inc*., 663 N.W.2d 447, 453 (Mich. 2003). Whether the contract language is ambiguous is a question of law. *Id*. at 451.

### III

Although Nationwide has moved for summary judgment on a number of grounds, the Court finds that two in particular are dispositive. Pursuant to the unambiguous terms of the Policy, McDermott's loss is not covered because it was not the result of an accident. Further, even if coverage did apply, the loss would be excluded because it was the result of an increased hazard which was within an insured's knowledge and control. Nationwide's motion for summary judgment will be granted as it relates to possible coverage.

### A

An insurance policy is an agreement "between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 433–34 (Mich. 1992) (citing *Eghotz v. Creech*, 113 N.W.2d 815 (Mich. 1962)). Thus "insurance policies are subject to the same contract construction principles that apply to any other species of contract." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). And under familiar contract law, "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties[.]" *Klapp*, 663 N.W.2d at 456 (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994)). This is done using the unambiguous terms of the contract because "the language of the parties' contract is the best way to determine what the parties intended." *Klapp*, 663 N.W.2d at 457.

Accordingly, an insurance policy should be read like any other contract — "as a whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003) (citing *Singer v. Goff*, 54 N.W.2d 290 (Mich. 1952)). When interpreting such a policy, its terms are to be given their "ordinary and plain meaning." *Royal*, 706 N.W.2d at 432 (citation omitted).

And "unless a contract provision violates law or one of the traditional [contract] defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Rory*, 703 N.W.2d at 26. "[T]he judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of 'reasonableness' as a basis upon which courts may refuse to enforce unambiguous contractual provisions." *Id*. A contractual provision is ambiguous when it "irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning." *Royal*, 706 N.W.2d at 432 (citing *Lansing Mayor v. Public Service Comm.*, 680 N.W.2d 840, 847 (Mich. 2004)).

**B**

The clear, unambiguous language of the Policy establishes that Nationwide "cover[s] *accidental* direct physical loss to property described in Coverages A and B except for losses excluded under Section I – Property Exclusions." Policy C1 (emphasis added). None of these terms conflict with other provisions in the Policy, nor are they ambiguous. Thus, they will be applied as written. Under the ensuing analysis, because the fire loss to McDermott's residence was not caused by an "accident," it is not covered under the Policy.

The Policy covers losses that result from accidents, but it does not define what constitutes an accident. In similar cases where policies restrict coverage to accidents, without defining accident, the Michigan Supreme Court has "examined the common meaning of the term." *Allstate Ins. Co. v. McCarn*, 645 N.W.2d 20, 22 (Mich. 2002). Accordingly, an accident is "an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected." *Id*. at 23 (internal

quotation marks and citation omitted) (collecting cases). Moreover, an accident is evaluated from the standpoint of the insured. *Id*. Thus, "the appropriate focus of the term 'accident' must be on both the injury-causing *act* or *event* and its relation to the resulting property damage or personal injury." *Id*. (emphasis in original) (internal quotation marks and citation omitted).

Notably, under Michigan law, not all harm that was unintentional is "accidental" where the underlying conduct *was* intentional. "[W]here an insured does act intentionally, a problem arises in attempting to distinguish between intentional acts that can be classified as 'accidents' and those that cannot." *Id*. (internal quotation marks omitted) (quoting *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 839 (Mich. 1999)). The Michigan Supreme Court outlined a standard to determine whether a situation constitutes an "accident":

> [A] determination must be made whether the consequences of the insured's intentional act "either were intended by the insured or reasonably should have been expected because of the direct risk of harm intentionally created by the insured's actions. When an insured acts intending to cause property damage or personal injury, liability coverage should be denied, irrespective of whether the resulting injury is different from the injury intended. Similarly, . . . when an insured's intentional actions create a direct risk of harm, there can be no liability coverage for *any* resulting damage or injury, despite the lack of an actual intent to damage or injure."

*McCarn*, 645 N.W.2d at 23 (emphasis in original) (quoting *Masters*, 595 N.W.2d at 839). If an "act was intended by the insured, but the consequences were not, the act does constitute an accident, unless the intended act created a direct risk of harm from which the consequences should reasonably have been expected by the insured." *McCarn*, 645 N.W.2d at 23. As to perspective, "the question is not whether a *reasonable person* would have expected the consequences, but whether the *insured* reasonably should have expected the consequences." *Id*. (emphasis in original). Thus, "to avoid coverage, the consequence of the intended act, which created a direct risk of harm, reasonably should have been expected by the insured." *Id*.

-14-

Here, Mathews was an "insured" as defined by the Policy (he was married to McDermott, the named insured, and lived in the "residence premises").  *See* Policy A1.  There is little doubt that he caused the fire with his intentional use of excessive amounts of butane followed by the intentional lighting of a hand-held torch.  In sum, Mathews's intentional acts created a direct risk of harm which led to the loss of the residence he shared with McDermott.

It is equally clear that Mathews reasonably should have expected an open flame near copious amounts of liquid butane and butane vapor to cause a fire.  He testified that he knew butane was flammable — as he very well should have.  He purchased, at a minimum, dozens of cans of the gas.  The butane cans are clearly labeled with numerous warnings related to the danger they create when combined with heat or fire.  Indeed, the front of the can depicts a flame and the words "DANGER – FLAMMABLE."  Pl.'s Mot. Ex. 9, at 3156.  Mathews also testified that he was aware "that butane was highly flammable," and that he knew of the dangers associated with "any source of ignition around the butane."  Mathews Dep. 55–56.

It follows that Mathews, an insured under the Policy, reasonably should have expected his use of an open flame next to pools of liquid butane to cause a fire.  So although Mathews may not have intended to cause the fire, and may not have intended to burn down his house, his intentional acts created that direct risk.  A risk he reasonably should have been aware of.  Thus, the loss here was not the result of an "accident," and the Policy does not extend to cover it.

McDermott argues that such a reading is flawed: "MCL 500.2833 mandates fire insurance coverage for direct loss by fire, not accidental fire loss."  Def.'s Resp. 5.  She does not elaborate on the point.  Nevertheless, her argument is to no avail.  Michigan law does not require insurers to cover fire losses that are the direct result of intentional conduct (not merely accidental conduct).  As the Michigan Supreme Court emphasized in *McCarn*, insurance coverage must be

denied where an insured "acts intending to cause property damage or personal injury" and where "an insured's intentional actions create a direct risk of harm."  645 N.W.2d at 23 (citation omitted).  It would make little sense to require insurers to cover any loss that results from a fire, regardless of the cause.

Under well-established Michigan law, Mathews's conduct — and the resulting loss he caused — was not an "accident."  The fire was a direct risk of his conduct and the Policy does not require Nationwide to compensate its insureds for the loss.  Summary judgment on this point is warranted on Nationwide's behalf.

## C

And even if the fire is properly considered an accident, and the loss is subject to coverage under the Policy, McDermott is nonetheless precluded from recovery under the Increased Hazard exclusion.  That exclusion provides that Nationwide does not cover losses to property resulting from hazards that are "increased by a means within the control and knowledge of an insured."  Policy D1.

Again, this language is plain and unambiguous.  Mathews was an insured under the Policy, and the hazard of fire damage was increased when he emptied two dozen cans of butane into an enclosed space and then began using an open flame.  This hazard was increased by a means (the combination of butane and fire) that was necessarily within Mathews's control.  Accordingly, the loss is not covered by the Policy.

McDermott argues that while Mathews may not be able to recover, *she* is entitled to recovery under Michigan's "innocent co-insured" doctrine.  McDermott is incorrect, at least with respect to the doctrine's application to the increased hazard exclusion.[8]

---

[8] On the other hand, under the Intentional Acts exclusion of the Policy, or any fraudulent concealment exclusions, McDermott would be able to recover despite Mathews's conduct if she were an innocent coinsured.  *See*,

**1**

The Michigan Supreme Court first addressed whether one insured may recover after a co-insured causes a loss in *Monaghan v. Agric. Fire Ins. Co.*, 18 N.W. 797 (1884). The court established that "if the right of action has become barred as to one of the joint contractors, it has to all of them. . . . Any attempt on [one insured's] part to defraud the company by not complying with the conditions of the policy, or any false swearing or concealment or fraud in reference to the proofs of loss, *would defeat a recovery*." *Id.* at 804 (emphasis added).

Almost a century later, the Michigan Supreme Court introduced the "innocent co-insured" doctrine in *Morgan v. Cincinnati Ins. Co.*, 307 N.W.2d 53 (Mich. 1981). The Court established:

> [W]henever the statutory clause limiting the insurer's liability in case of fraud by the insured is used it will be read to bar only the claim of an insured who has committed the fraud and will not be read to bar the claim of any insured under the policy who is innocent of fraud.

*Id.* at 55. The decision was grounded in public policy, as the court noted that barring recovery to all insureds based on one's fraudulent conduct would require "that each insured must not only undertake to forbear from fraud himself, but must also undertake to prevent each of the other persons insured from engaging in fraud on pain of losing all interests under the policy." *Id.* The court refused to dictate such a requirement, noting that "an insured often has no control over the conduct of others." *Id.*

Then, in *Borman v. State Farm Fire & Cas. Co.*, 521 N.W.2d 266 (Mich. 1994), the Michigan Supreme Court expanded the scope of the "innocent co-insured" doctrine to cover not only fraudulent acts, but intentional conduct as well. The court prohibited "an insurer from denying coverage to an insured who is innocent of wrongdoing based upon the wrongdoing of

---

*e.g.*, Policy D1 (Intentional Acts are excluded from coverage "for all **insureds**, except for innocent co-**insureds** when the loss is caused by fire." (emphasis in original)).

any other coinsured." *Id*. at 267. The court then concluded that an intentional acts exclusion was not permissible where the exclusion barred recovery to an innocent spouse.[9] *Id*. at 270. Since *Borman*, the Michigan Supreme Court has not revisited the application of the "innocent co-insured" doctrine.

Lower Michigan courts, however, have applied to doctrine since 1994. These courts have highlighted a critical distinction in the *Borman* decision: insurance policies that preclude recovery for wrongful conduct of "any" insured rather than "the" insured.

In *Home Owners Ins. Co. v. Selfridge*, No. 280112, 2008 WL 5273418, at *2 (Mich. Ct. App. Dec. 18, 2008), the Michigan Court of Appeals established that "[i]n cases where policy language voids the policy because of 'any' or 'an' insured's fraudulent conduct, no other insured, including innocent coinsureds, may recover under that policy." *Id*. (quoting *Michigan Basic Prop. Ins. Assoc. v. Wasarovich*, 542 N.W.2d 367, 370 n.2 (Mich. Ct. App. 1995)). The court in *Selfridge* took care to note that the trial court was required "to declare that the 'entire policy is void'" where "[t]he phrase 'entire policy' is unambiguous and it includes coverage for all insureds; the policy contains no language indicating that the policy is void only as to *the insured* making the false statements." *Selfridge*, No. 280112, 2008 WL 5273418, at *2 (emphasis added).

## 2

Likewise, in this case, there is no ambiguity in the Policy's increased hazard exclusion. It clearly provides that losses caused by increased hazards "within the control and knowledge of *an insured*" are excluded from coverage. Policy D1 (emphasis added). The Policy does not limit

---

[9] It is important to note that the exclusion clause in *Borman* voided the policy because of the wrongful conduct of "the insured," rather than conduct of "an" or "any" insured.

the exclusion to conduct of "the" insured, nor does it address intentional conduct.[10] Thus, this case is distinguishable from *Morgan* (where one innocent coinsured could not be precluded from recovery due to the intentional wrongdoing of another insured) and *Borman* (where the insurance policy only excluded coverage for "the" insured); the Policy here expressly excludes losses caused by increased hazards within the knowledge and control of an insured. *Selfridge* provides a well-reasoned guide.

Further, Michigan courts have never applied the "innocent co-insured" doctrine to anything but intentional conduct (intentional wrongdoing or fraud). This, as a matter of policy, makes sense. Nationwide only agreed to protect against harms where McDermott or Mathews could not be relied upon to mitigate risk. For example, if the house was hit by lighting and burned, there is nothing McDermott or Mathews could have done to prevent it. Further, if Mathews decided to *intentionally* burn down the house, while he could not recover, McDermott could. This is so because she could not be expected to mitigate the risk of Mathews's intentional conduct, nor could he (as he intended the harm).[11] *See Morgan*, 307 N.W.2d at 55 ("an insured often has no control over the conduct of others.").

But in this case, Nationwide did not agree to provide coverage for conduct which created risks an insured was aware of and could control. In such a scenario, Nationwide rightfully could rely upon its insured to mitigate the risks he or she created. If an insured failed to do so, Nationwide cannot be compelled to provide coverage. Such is the case here: Mathews was an insured, had knowledge and control of the hazard he created, yet did nothing to mitigate that risk.

---

[10] Again, we reach this issue only if Mathews's conduct is deemed wholly accidental, and therefore intentional conduct does not apply to this analysis.

[11] This distinction was recognized by Nationwide. To comply with Michigan law, it went through the effort to carve out an exception for innocent co-insureds under the Intentional Acts exclusion. *See* Policy D1.

Nationwide, by the clear terms of the Policy, is not obligated to provide coverage under these circumstances.  Michigan case authority and public policy do not require a different result.

**D**

There is one additional issue that requires attention.  In its motion, Nationwide argues that it "is entitled to a return of all payments mistakenly made to McDermott."  Pl.'s Mot. 20.  Nationwide points out that under Michigan law,

> As a general rule, a payment made under a mistake of fact which induces the belief that the other party is entitled to receive the payment when, in fact, the sum is neither legally nor morally due to him, may be recovered, provided the payment has not caused such a change in the position of the payee that it would be unjust to require the refund . . . .

Pl.'s Mot. 20 (quoting *Wilson v. Newman*, 617 N.W.2d 318, 321 (Mich. 2000)).  However, it is also clearly established that "the payment cannot be recalled when the situation of the party receiving the money has been changed in consequence of the payment, and it would be inequitable to allow a recovery."  *Newman*, 617 N.W.2d at 321 (quoting *Walker v. Conant*, 31 N.W. 786 (Mich. 1887)).

At this point, the Court lacks sufficient information to determine whether Nationwide is entitled to any or all of the sum it paid to McDermott.  The parties will be directed to file supplemental briefing on the issue, not to exceed ten pages, and Nationwide's motion will be denied as it relates to this point.

**IV**

Accordingly, it is **ORDERED** that Nationwide's motion for summary judgment, ECF No. 15, is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that the parties are **DIRECTED** to file supplemental briefing concerning the monetary amount to be awarded to Nationwide. Nationwide's supplemental brief, limited to ten pages, is due by **July 29, 2013**. McDermott's supplemental briefing concerning the same, also limited to ten pages, is due no later than **August 12, 2013**.

Dated: July 15, 2013                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 15, 2013.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS