UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,

        Plaintiff/Counter-Defendant,               Case No. 12-11863
                                                    Honorable Thomas L. Ludington

v.

KASEY McDERMOTT,

        Defendant/Counter-Plaintiff.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF/COUNTER-DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT/COUNTER
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DIRECTING
SUBMISSION FROM PLAINTIFF/COUNTER DEFENDANT**

On January 13, 2012, Brien Mathews—while manufacturing and smoking marijuana—accidentally started a fire that burned down the home he lived in with Kasey McDermott. After making payments of well over $100,000 for the loss, Nationwide Mutual Fire Insurance Company (Nationwide)—which had issued a fire-insurance policy on the home—denied McDermott's claim for coverage. The Court agreed with Nationwide's decision, concluding that, as a matter of law, McDermott's loss is not covered by the applicable policy. *See* July 15, Op. & Order 13–19, ECF No. 26.

But that does not mean McDermott should be liable to Nationwide for the payments it made as a result of the fire. Both parties have moved for summary judgment on the issue. Based on what follows, Nationwide's motion will be granted and McDermott's motion will be denied.

**I**

The facts underlying this case were detailed in the Opinion and Order granting Nationwide summary judgment on the coverage issue. *See id.* at 1–10. Accordingly—aside

from those facts essential to the question presented here—only a cursory background will be provided.

In September 2005, McDermott purchased the home located at 202 South Woodbridge Street in Bay City, Michigan. She took up residence along with her two children from a previous marriage and Brien Mathews.[1] At that time, McDermott entered into a homeowner-insurance agreement (the Policy) with Nationwide. Under the Policy, McDermott made periodic payments and Nationwide provided "the insurance described in th[e] policy." Pl.'s First Mot. Ex. 2, at A1, ECF No. 15.

While living in McDermott's home, Mathews manufactured marijuana in the basement using a process known as "butane extraction." The process involves drawing liquid butane through chopped marijuana leaves, and as one might expect, it can be dangerous. On January 13, 2012, Mathews made a mistake, introduced an open flame to a butane-rich environment, and burned the Woodbridge Street residence to the ground.

So McDermott filed a claim for coverage under the Policy. On January 13, 2012, the same day as the fire, Nationwide issued an advance payment of $5,000 to McDermott. Stordeur Aff. ¶ 5, *attached as* Pl.'s Second Mot. Ex. 1, ECF No. 48. McDermott signed a reservation of rights agreement when she received the payment.[2] That reservation of rights agreement made clear that repayment of the advance, in the event McDermott's claim was denied, was mandatory:

> In good faith and to prevent any undue hardship which this loss may cause you, we offer to advance to you $5,000.00 on the loss under the following terms and conditions.

---

[1] Although Mathews and McDermott were dating in September 2005, they were married on February 23, 2006.

[2] McDermott dated the reservation of rights agreement "1/14/11," *see* Pl.'s Second Mot. Ex. 2, but presumably this was simply an error—she did not receive the $5,000 payment until one year later (after the January 2012 fire).

(1)    that this advance shall not be considered payment under any portion of the policy.

(2)    that if either the policy or the claim is not valid and payment is not required by us, you will repay the advance, and

(3)    we, in making this advance, reserve and do not waive any right or requirement under the policy number 172150 whether procedural or substantive.

Pl.'s Second Mot. Ex 2.  The reservation of rights agreement also established that with her signature, McDermott understood "that [Nationwide] reserve[d] all rights and requirements" under the Policy.  *Id.*

The undisputed facts show that Nationwide also made payments to McDermott (or on her behalf) on January 27 and 30, 2013.  Those payments amount to $2,981.75.  Stordeur Aff. ¶¶ 11–22.

Nationwide hired Rehmann Corporate Investigative Services to investigate the origins of the January 13, 2012 fire.  On January 31, 2012, Kevin G. Pike, one of Rehmann's investigators, authored an opinion concerning the cause for McDermott's house fire.  In his report, Mr. Pike established that the fire was caused by Mathews's marijuana production:

> [Mathews] stated that he was the only person home at the time of the fire.  He stated he was downstairs in the basement doing a butane extraction with THC.  Per [Mathews], he is a medical marijuana license holder.  [Mathews] stated that he was packing the marijuana in a quart jar with butane to remove the THC, and it is then poured into four pie plates.  [Mathews] stated that he waits for the butane to evaporate and as wax builds up, he scrapes it off with a razor.  [Mathews] stated that he used a lighter to melt the wax from the razor blade when an ember or spark of wax landed in a pie plate, which caught fire.

Pike Report 2, *attached as* Pl.'s Second Mot. Ex. 3.  Mr. Pike also concluded that "[b]ased on the information obtained by myself, reconstruction of the scene, and fire patterns analyzed, this fire is an accidental fire."  *Id.* at 3.  It is undisputed that Nationwide received Mr. Pike's report on February 3, 2012.  *See* Pl.'s Second Mot. 5; Def.'s Second Resp. 3, ECF No. 51.

Long before the fire, McDermott obtained mortgage financing on the 202 South Woodbridge property from J.P. Morgan Chase Bank NA (Chase), and Chase is named in the Policy as the first (and only) mortgagee.  *See* Policy Declarations 2, *attached as* Pl.'s Second Mot. Ex. 4.  In fact, the mortgage agreement between McDermott and Chase *required* her to obtain insurance on the property:

Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. . . . The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

Mortgage Agreement ¶ 4, *attached as* Pl.'s Supp. Br. Ex. 1, ECF No. 57.

Pursuant to the Mortgage Agreement, McDermott's Policy with Nationwide contains a mortgage clause that provides, "[i]f a mortgagee is named in this policy, a loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear."  Policy E3, *attached as* Pl.'s Second Mot. Ex. 5.  Further, under the Policy, if Nationwide pays "the mortgagee for loss" but later denies payment to the insured, it is "subrogated to all the rights of the mortgagee granted under the mortgage on the property," or, at Nationwide's option, it "may pay to the mortgagee the whole principal on the mortgage plus accrued interest."  *Id*.  If Nationwide elects the latter route, it "will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt."  *Id*.

Pursuant to the Mortgage Clause in the Policy, Nationwide issued a check for $131,859.29 on March 23, 2012.  The check is made out to McDermott, Chase, and Michigan Fire Claims, Inc.  *See* Pl.'s Second Mot. Ex. 6, at 3.  At some point, Michigan Fire President Nik Kalaj endorsed the check, as did McDermott.  *Id*. at 4.  Then McDermott sent the check to Chase

on April 18, 2012. *Id*. at 5. She requested that Chase "accept the enclosed check from Nationwide Insurance in the amount of $131,859.29 to pay off the above referenced mortgage loan. Please send the overage to: 2126 Fourth St. Bay City, MI 48708." *Id*. Chase then processed the payment, and returned an overpayment of $2,638.50 to McDermott, which she kept. *Id*. at 7, 8.

On April 25, 2012, counsel for Nationwide sent McDermott a letter denying her insurance claim and asserting a reservation of rights. *See* Pl.'s Second Mot. Ex. 7. The letter established that Nationwide made payments, to McDermott or on her behalf, amounting to $160,209.50 (including the $5,000; $2,981.75; and $131,859.29 payments detailed above). However, Nationwide now seeks only the return of the three amounts that have been discussed—totaling $139,841.04—so the remaining payments for $20,368.46 are of no import. The letter also explained why Nationwide was denying McDermott's claim for coverage, *id*. at 3–7, and then indicated that Nationwide had filed this lawsuit "to determine the rights and obligations of the parties under the policy, and to obtain reimbursement of the amounts paid to date on this claim," *id*. at 7.

As indicated above, the Court concluded that—as a matter of law—McDermott's loss was not covered because it was not the result of an accident, *see* July 15, 2013 Op. & Order 13–16, and that even if it was, recovery under the Policy was precluded by an "Increased Hazard exclusion," *id*. at 16. The Court provided time for the parties to brief the issue concerning whether McDermott should be required to repay the money Nationwide issued to her or on her behalf. Based on the parties' supplemental briefs, the Court denied summary judgment as it related to the recovery of payments. *See* Sept. 10, 2013 Op. & Order, ECF No. 42.

The parties then requested, and were provided, the opportunity to file additional motions for summary judgment concerning whether McDermott is liable to Nationwide for the payments it made as a result of the fire. They both capitalized on that opportunity, filing cross motions on October 31, 2013.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III

In her motion for summary judgment, and in her response to Nationwide's second motion for summary judgment, McDermott presents a number of arguments for why she is not liable to Nationwide for the money it paid to her or on her behalf.[3] First, in her own motion, she argues that Nationwide is not entitled to subrogation because "an insurer may not subrogate against its

---

[3] While McDermott claims generally that "Michigan law does not allow for reimbursement of [the] voluntary payments" made by Nationwide, *see* Def.'s Mot. 1, she does not differentiate between the $131,859.29 paid in March 2012 and the other $7,981.75 paid in January 2012. Indeed, it appears that the majority of McDermott's arguments pertain only to the $131,859.29 that was paid after receipt of Mr. Pike's causation report in February 2012. Accordingly, whether McDermott is liable for that amount will be addressed first, with the other amounts to follow.

own insured." Def.'s Mot. 2 (citing *Prestige Ins. Co. v. Michigan Mutual Ins. Co.*, 99 F.3d 1340, 1352 (6th Cir. 1996)).  In her response to Nationwide's second motion for summary judgment, McDermott asserts a second reason that Nationwide is not entitled to be subrogated to Chase's interests: Nationwide delivered the check to her, and then *she* "elected to pay off the mortgage." Def.'s Second Resp. 2.

McDermott's next line of argument—presented in her response to Nationwide's second motion—is that Nationwide made a voluntary payment, not a contractually-obligated one, because Chase never "rendered a 'signed, sworn proof of loss.'" *Id*. at 3.  McDermott concludes that because Nationwide was not contractually required to pay Chase, subrogation cannot apply.

Another argument that McDermott asserts, in both her motion for summary judgment and her response to Nationwide's second motion, is that, "[p]resumably [Nationwide] is seeking reimbursement from Defendant McDermott under the policy language which states: 'If we void this policy, you must reimburse us if a claim payment was made.'" Def.'s Mot. 5.  She then asserts that Nationwide "has no contractual rights . . . to seek reimbursement . . . because it did not 'void this policy.'" *Id*. at 6.[4]

Finally, McDermott argues in her response to Nationwide's motion that even assuming Nationwide's payments were the result of mistakes of fact, she "had no reason to believe the payments a mistake" and that "[t]he equities favor Ms. McDermott . . . ."  Pl.'s Second Resp. 5, 6.  Upon review, and discussed below, each of these arguments is without merit. Nationwide's motion for summary judgment will be granted and McDermott's will be denied.

---

[4] In her response to Nationwide's second motion for summary judgment, McDermott repeats the argument and claims that "[t]here is no justification for seeking contractual reimbursement."  Def.'s Second Resp. 6.

**A**

McDermott's primary argument is that Nationwide is not entitled to subrogation.  She argues that an insurer may "not subrogate against its own insured," Def.'s Mot. 2, and that even if Nationwide *could* do so, it paid McDermott, not Chase, and so Nationwide did not "step into the shoes of Chase."  Def.'s Second Resp. 4.  On both fronts, McDermott is incorrect.

**1**

In *Prestige*, the Sixth Circuit did indicate "the general rule is that an insurer may not bring a subrogation action against its own insured."  99 F.3d at 1352.  But the court only noted the general rule; it went on to conclude that "the right to subrogate arises by contract, and since Bogle is not a party to Michigan Mutual's insurance contract, Michigan Mutual cannot impose the subrogation provisions in their policy against him."  *Id.*  Thus, the Sixth Circuit did not preclude subrogation because an insurer may *never* bring a subrogation action against its insured, only because the parties involved had not entered into an enforceable subrogation agreement.

And though subrogation by an insurer against its insured is not the norm, numerous Michigan courts, and federal courts applying Michigan law, have enforced subrogation provisions like the one between McDermott and Nationwide in the Policy.  As explained in *French v. Grand Beach Co.*, 215 N.W. 13 (Mich. 1927), Michigan courts have recognized two forms of subrogation:

> The doctrine of subrogation rests upon the equitable principle that one, who, in order to protect a security held by him, is compelled to pay a debt for which another is primarily liable, is entitled to be substituted in the place of and to be vested with the rights of the person to whom such payment is made, without agreement to that effect.  This doctrine is sometimes spoken of as "legal subrogation," and has long been applied by courts of equity.  There is also what is known as "conventional subrogation."  It arises from an agreement between the debtor and a third person whereby the latter, in consideration that the security of the creditor and all his rights thereunder be vested in him, agrees to make

> payment of the debt in order to relieve the debtor from a sacrifice of his property
> due to an enforced sale thereof.

*Id*. at 14 (citing *Stroh v. O'Hearn*, 142 N.W. 865 (Mich. 1913)).  The Michigan Supreme Court explained in *Stroh* that "[s]ubrogation is an equitable doctrine depending upon no contract or privity, and proper to apply whenever persons other than mere volunteers pay a debt or demand which in equity and good conscience should have been satisfied by another."  142 N.W. at 869.

In *Wilson v. Home Owners Mut. Ins. Co.*, 384 N.W.2d 807 (Mich. Ct. App. 1986), the Michigan Court of Appeals acknowledged that the language of the "Michigan Standard Policy"—a form of insurance policy adopted by statute for general use throughout Michigan—allowed for "an insurer [to] make a payment of loss to a mortgagee, and to the extent of that payment, . . . be subrogated to all the mortgagee's rights of recovery . . . ."  *Id*. at 809. Accordingly, courts have recognized that in Michigan a subrogation provision between an insurer and an insured is standard and enforceable.

The *Wilson* decision was based, in part, on a Michigan Supreme Court decision establishing that subrogation provisions between insurers and insureds are enforceable: "The mortgage clause, quoted supra, provides for subrogation upon payment to the mortgagee and claim that as to the mortgagor or owner no liability exists."  *McAlpine v. State Mut. Fire Ins. Co. of Michigan*, 295 N.W. 224, 226 (Mich. 1940); *see also Lee v. Royal Indem. Co.*, 108 F.3d 651, 653 (6th Cir. 1997) ("Under the insurance contract, it is undisputed that National Mortgage would have had the right to receive payment from the insurer for the amount of its interest, i.e., the mortgage").

It follows that Michigan courts will uphold a subrogation provision like the one involved in McDermott's policy, and that Nationwide is not foreclosed from recovering simply because McDermott is its insured.  As the Sixth Circuit established in *Shelby Cnty. Trust & Banking Co.*

*v. Security Ins. Co. of New Haven, Conn.*, 66 F.2d 120 (6th Cir. 1933), a district court does not

error in awarding subrogation where a contract "specifically provided that on payment to such

mortgagee of any sum for loss or damage under the policy, to the extent of such payment the

insurer should be subrogated to the mortgagee's right of recovery and claim upon the collateral

to the mortgage debt."  *Id.* at 122; *see also Reed v. Fid. Nat. Ins. Co.*, No. 07-13775, 2010 WL

446177, at *4 (E.D. Mich. Jan. 27, 2010) (applying Michigan law and concluding that plaintiffs

"were not entitled to claim the portion of the proceeds that went to pay the mortgagee" even if a

jury returned a verdict in their favor because the insurer was "entitled to a setoff of the proceeds

paid to the [plaintiffs'] mortgagees.").

        McDermott relies on the so-called "antisubrogation" rule to support her argument that

Nationwide cannot collect here.  But as she acknowledges, the antisubrogation rule establishes

that "no right of subrogation can arise in favor of an insurer against its own insured or coinsured

for a risk covered by the policy, even if the insured is a negligent wrongdoer."  Def.'s Mot. 2

(quoting *Buckey State Mutual Ins. Co. v. Humlicek*, 822 N.W.2d 351, 354 (Neb. 2012)).  But this

is not a case where Nationwide seeks subrogation "for a risk covered by the policy," the Court

has already concluded that McDermott's losses were *not* entitled to coverage.  *See* July 15, 2013

Op. & Order 13–16.

**2**

        It is also irrelevant that Nationwide delivered the check to McDermott and not directly to

Chase, as the check was made out to three parties but not in the alternative.  Indeed, the check

indicates that it is payable to "Kasey McDermott *and* JPMORGAN CHASE BANK NA *and*

Michigan Fire Claims, Inc."  Pl.'s Second Mot. Ex. 6, at 3 (emphasis added).  Under Michigan

law, "[i]f an instrument is payable to 2 or more persons not alternatively, it is payable to all of

them and may be negotiated, discharged, or enforced only by all of them."  Mich. Comp. Laws §
440.3110(4).  The applicable UCC commentary explains the operation of a note payable to more
than one party in the conjunctive:

> An instrument payable to X and Y is governed by the second sentence of
> subsection (d).  Section 3-301.  If an instrument is payable to X and Y, neither X
> nor Y acting alone is the person to whom the instrument is payable.  Neither
> person, acting alone, can be the holder of the instrument.  The instrument is
> "payable to an identified person."  The "identified person" is X and Y acting
> jointly.  Section 3-109(b) and Section 1-102(5)(a).  Thus, under Section 1-201(20)
> X or Y, acting alone, cannot be the holder or the person entitled to enforce or
> negotiate the instrument because neither, acting alone, is the identified person
> stated in the instrument.

UCC Comment to Mich. Comp. Laws § 440.3110(4).  Thus McDermott's argument that she
"elected to pay off the mortgage" is incorrect, *see* Def.'s Second Resp. 2, for she could not
negotiate the note without Chase's approval.  Accordingly, when Nationwide delivered the check
to McDermott, and then she notarized it and delivered it to Chase for payment of the mortgage,
Nationwide was entitled to credit for paying off the mortgage balance.  *See*, *e.g.*, *Knapp Transit
Mix Co. v. Highland Greens, Inc.*, 216 N.W.2d 84, 86 (Mich. Ct. App. 1974) (providing that
check made payable to two parties could be divided as the parties "saw fit, but not to the
detriment of [the payor].  It was entitled to credit on its account").

Therefore, subrogation is not precluded because of McDermott's relationship with
Nationwide or because Nationwide delivered the check to McDermott instead of Chase.  Under
the Policy, Nationwide is entitled to be subrogated to Chase's legal position after paying the
principal on McDermott's mortgage.  *See* Sept. 10, 2013 Op. & Order 9.

**B**

McDermott further contests the applicability of subrogation by asserting that Nationwide
was "not required to make payment to the mortgagee" because Chase never submitted "a signed,
sworn proof of loss."  Def.'s Second Resp. 3.  But this argument conflates two different

provisions of the Mortgage Clause in McDermott's Policy, and it is directly contradicted by arguments she has previously made.  Thus, it is without merit.

The Mortgage Clause only requires a mortgagee to submit a "signed, sworn proof of loss" in order to retain a valid claim when the mortgagor's claim is denied but it has yet to be paid.  *See* Policy E3.  Instead, as here, when Nationwide first pays the "mortgagee for loss" and then denies payment to the insured, it is "subrogated to all the rights of the mortgagee granted under the mortgage on the property."  *Id*.  Under these circumstances, the mortgagee has already been paid, and so there is no need to submit a signed, sworn proof of loss in order to preserve the mortgagee's rights.

Additionally, although she now claims that Nationwide was not obligated to pay Chase, McDermott previously took the opposite position; she argued that Nationwide *was* contractually obligated to pay Chase.  *See* Def.'s Supp. Br. 2, ECF No. 40 (McDermott indicated that Nationwide's payment to Chase was not recoverable because Nationwide had "a separate enforceable contract between the insurer and mortgagee, entitling the mortgagee to payment if the insured's claim is denied.").  Because the Court agreed with McDermott that Nationwide was obligated to pay Chase pursuant to the "standard mortgage clause" outlined in the Policy, she cannot now switch gears just because it would be helpful to her fresh arguments.  Under the judicial estoppel doctrine, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).  So even if Nationwide was not obligated to pay Chase—which it was[5]—McDermott is estopped from raising the argument.

_____

[5] In Michigan, "[a] standard mortgage clause constitutes a separate and distinct contract between the mortgagee and the insurance company for payment on the mortgage."  *Marketos v. American Employers Ins. Co.*, 612 N.W.2d 848,

**C**

McDermott also argues, in both her motion and her response to Nationwide's second motion, that Nationwide never voided the policy, and thus there is "no justification for seeking contractual reimbursement." Def.'s Second Resp. 6; *see also* Def.'s Mot. 5–6. This argument, however, is wholly without merit.

Nationwide agrees that it is "not voiding the policy" but argues it "has no need to do so to recover its payments in this case." Pl.'s Resp. 15. Nationwide is correct. As the Court previously held, McDermott is not entitled to any payments under the Policy because her loss is not covered. *See* July 15, 2013 Op. & Order 13–16. There is no need for Nationwide to void the Policy to deny coverage. Moreover, Nationwide has ample justification for seeking reimbursement of the three payments totaling $139,841.04: the subrogation provision of the Mortgage Clause as to the $131,859.29; the reservation of rights agreement as to the $5,000; and the fact that the other $2,981.75 comprised voluntary payments made before the origin of the fire was known.

**D**

McDermott's final argument—that she should not be liable to Nationwide because she "had no reason to believe the payments were a mistake," Pl.'s Second Resp. 5—can only apply to Nationwide's January 2012 payments totaling $7,981.75. Discussed above, Nationwide paid off McDermott's mortgage balance because it was contractually obligated to do so per the Mortgage Clause in the Policy, and it is therefore subrogated to Chase's interests. Accordingly, McDermott is liable to Nationwide for the amount it paid to Chase—$131,859.29.

---

853 (Mich. Ct. App. 2000), *rev'd in part on other grounds*, 633 N.W.2d 371 (Mich. 2001). "[U]nder a standard mortgage clause, payment must be made to the mortgagee to the extent of its interest, and then the balance of the insurance proceeds, if any, can be sought by the mortgagor." *Id.* at 853.

Michigan law also provides "that money paid under a mistake of material facts may be recovered back" unless "the situation of the party receiving the money has been changed in consequence of the payment, and it would be inequitable to allow a recovery." *Wilson v. Newman*, 617 N.W.2d 318, 321 (Mich. 2000) (quoting *Walker v. Conant*, 31 N.W. 786 (Mich. 1887)). The money Nationwide paid to McDermott in January 2012, before it received Mr. Pike's causation report, was made pursuant to a mistake of fact (Nationwide had yet to discover the origins of the January 13, 2012 fire). So McDermott must repay those amounts unless she can demonstrate a change in consequence that would make repayment inequitable. *See Wilson*, 463 N.W.2d at 322 ("If the plaintiffs can demonstrate a change of position or detrimental reliance . . . they may be entitled to retain all or part of the funds mistakenly paid by Allmerica.").

But McDermott has not carried her burden of showing a change in circumstances. She simply argues that she "did not know her claim would not be paid" and thus "had no reason to believe she would be required to reimburse Plaintiff Nationwide." Def.'s Second Resp. 5, 6. Other than quickly claiming that she "works 40-45 hours a week as a dispatcher [and] cannot reimburse Plaintiff Nationwide," *id*. at 6, McDermott makes no other arguments to support her contention that she should not be required to repay Nationwide its January 2012 payments.

McDermott's assertion that she did not know she would have to repay Nationwide, or that her claim would be denied, matters not. As the Michigan Supreme Court established in *Wilson*, mistaken payments "*which induces the belief that the other party is entitled to receive the payment* when, in fact, the sum is neither legally nor morally due to him, may be recovered . . . ." 617 N.W.2d at 321 (citation omitted) (emphasis added).

And requiring McDermott to repay the remaining $7,981.75 would work no inequity.  As to the $5,000 Nationwide paid to McDermott on January 13, 2012, McDermott signed an agreement expressly establishing that if her "claim is not valid" she would "repay the advance." Pl.'s Second Mot. Ex. 2.  Nationwide rightfully denied McDermott's claim, and thus she is required to pay back the $5,000 advance.  McDermott does not contest the point in her motion for summary judgment or in her response to Nationwide's second motion for summary judgment.

Likewise, McDermott has not demonstrated that requiring repayment of the January 27 and 30, 2013 payments totaling $2,981.75 would be inequitable.  As established by *Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*, No. 278712, 2009 WL 609561 (Mich. Ct. App. Mar. 10, 2009), to foreclose recovery of mistaken payments, a payee must "demonstrate that it relied to its detriment on the payor's mistaken payment, e.g., if the means to collect the money owed is no longer available, then return of the payor's money is unjust."  *Id.* at *4.  McDermott has not demonstrated that the means to collect the money owed would have been available but for Nationwide's mistaken payment.  She also has not demonstrated that the means to collect the money owed is not available at all.  Thus there is no inequity in requiring her to repay the $2,981.75 Nationwide paid by mistake.

It follows that McDermott is liable to Nationwide for all three amounts it seeks: the $131,859.29 paid toward McDermott's mortgage (pursuant to the subrogation provision in the Mortgage Clause of the Policy); the $5,000 paid on January 13, 2012 (pursuant to the reservation of rights agreement); and the $2,981.75 paid on January 27 and 30, 2012 (as those payments were made before the origin of the fire was known and McDermott has not demonstrated it would be inequitable to require repayment).

**IV**

Accordingly, it is **ORDERED** that Nationwide's second motion for summary judgment, ECF No. 48, is **GRANTED**.

It is further **ORDERED** that McDermott's motion for summary judgment, ECF No. 47, is **DENIED**.

It is further **ORDERED** that McDermott is liable to Nationwide in the amount of $139,841.04.

It is further **ORDERED** that Nationwide prepare and submit, to both the Court and McDermott, a proposed judgment consistent with this opinion as well as the Court's July 15, 2013 Opinion and Order.  Nationwide's submission is due on or before **April 22, 2014**.

Dated: April 15, 2014

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

<div style="border:1px solid black">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 15, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>